IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORMA LAUDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18CV480 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, [1] | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Norma Lauder ("Plaintiff") brought this action pursuant to Section 205(g) of

the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review

of a final decision of the Commissioner of Social Security with respect to her claim for

Disability Insurance Benefits under Title II of the Act. The parties have filed cross-motions

for judgment, and the administrative record has been certified to the Court for review.

I.   PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance Benefits on February 7, 2011,

alleging a disability onset date of July 12, 2010. (Tr. at 181-182.)[2] Her application was denied

initially (Tr. at 114-117) and upon reconsideration (Tr. at 122-129). Thereafter, Plaintiff

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Docs. #9 and 12].

requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 130-131.) Plaintiff, along with her attorney, attended the subsequent hearing on May 2, 2013. (Tr. at 52.) Following the hearing, the ALJ concluded that Plaintiff was disabled within the meaning of the Act from July 12, 2010 through June 25, 2012. (Tr. at 33.) He further found that, beginning June 26, 2012, medical improvement occurred such that Plaintiff no longer met the requirements of the Act. (Tr. at 35, 38.) On September 19, 2014, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

Plaintiff appealed the ALJ's decision to this Court and the Commissioner voluntarily agreed to request a remand for further review of new evidence submitted to the Commissioner after the ALJ issued his decision.[3] (Tr. at 916-922.) Upon remand, on February 9, 2017, Plaintiff, along with her attorney, attended a second hearing. (Tr. at 865-914.) Following the hearing, the ALJ, in a decision rendered on August 17, 2017, again concluded that Plaintiff was disabled within the meaning of the Act from July 12, 2010 through June 25, 2012. (Tr. at 834.) He further found that, beginning June 26, 2012, medical improvement occurred such that Plaintiff no longer met the requirements of the Act. (Tr. at 835, 846.) On April 11, 2018, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusions the Commissioner's final decision for purposes of review. (Tr. at 803-807.)

---

[3] In May of 2015, Plaintiff filed a second application seeking Disability Insurance Benefits, alleging a disability onset date of September 12, 2013. (Tr. at 1022-28.) The ALJ consolidated both Plaintiff's claims and addressed them simultaneously in his decision. (Tr. at 826.)

## II.   LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the

3

ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant

is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [ALJ] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the ALJ cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

When determining whether a claimant who has previously been found to be disabled continues to be disabled, the ALJ uses an eight-step sequential evaluation process. This eight-step process provides that: (1) if the claimant is engaging in substantial gainful activity,

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

disability ends; (2) if the claimant has an impairment or combination of impairments that meets or medically equals a listing, disability continues; (3) if the claimant does not meet or equal a listing, the ALJ will determine whether "medical improvement" has occurred;[5] (4) if medical improvement has occurred, the ALJ will determine whether the improvement is related to the claimant's ability to work; (5) if there is no medical improvement, or the medical improvement is found to be unrelated to the claimant's ability to work, disability continues, subject to certain regulatory exceptions; (6) if there has been medical improvement related to the claimant's ability to work, the ALJ will determine whether all of the current impairments, in combination, are "severe," and if not, disability ends; (7) if the claimant's impairments are considered "severe," the ALJ will determine the claimant's RFC, and if the claimant is able to perform past relevant work, disability ends; (8) if the claimant is unable to perform past relevant work, the ALJ will determine whether the claimant can perform other work given his or her residual functional capacity, age, education, and past work experience. See 20 C.F.R. §§ 404.1594(f); Tickle v. Berryhill, No. 1:16CV204, 2017 WL 3382463, at *3 (M.D.N.C. Aug. 4, 2017) (concluding that the eight-step sequential analysis would apply in cases where the ALJ finds a closed period of disability).

III.   DISCUSSION

In the present case, the relevant period under consideration is from June 26, 2012, the date the ALJ found that Plaintiff's disability ended, through August 17, 2017, the date of the

---

[5] The Social Security regulations define "medical improvement" as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled." 20 C.F.R. § 404.1594(b)(1). "A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with your impairment(s)." Id.

ALJ's decision. (Tr. at 846.) In his decision, the ALJ initially found that Plaintiff had engaged in "substantial gainful activity" during the following period: August 25, 2014 through November 7, 2014. (Tr. at 830.) The ALJ next found that despite this there had been a twelve-month period during which Plaintiff had not engaged in "substantial gainful activity" during the remainder of the relevant period. (Id.) Plaintiff therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that, from July 12, 2010 to June 25, 2012, Plaintiff suffered from the following severe impairments:

> seizure disorder due to left temporal impairment causing neurological dysfunction and cognitive impairment, chronic fatigue syndrome, fibromyalgia, and psychological impairments including depression, anxiety, and post-traumatic stress disorder.

(Tr. at 830 (internal citations omitted).) The ALJ found at step three that from July 12, 2010 through July 25, 2012, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. at 831.) The ALJ next found that from July 12, 2010 through June 25, 2012, Plaintiff had the RFC to perform sedentary work involving simple, routine, repetitive tasks in a nonproduction environment, but not on a regular and consistent full-time basis. (Tr. at 831-832.) At step four, the ALJ found that from July 12, 2010 through June 25, 2012, Plaintiff was unable to perform any past relevant work. (Tr. at 834.) At step five, the ALJ concluded that from July 12, 2010 through June 25, 2012, considering Plaintiff's age, education, work experience, and RFC, there were not jobs in the national economy that she could have performed. (Tr. at 835.) Therefore, Plaintiff was under a disability, as defined by the Act, during that period. (Id.)

The ALJ further determined that, beginning June 26, 2012, Plaintiff's disability ended. (Id.) The ALJ therefore followed the eight-step sequential evaluation process, and found that

as of June 26, 2012, Plaintiff had not developed any new impairments, so her severe impairments remained the same. (Id.) The ALJ then found that as of June 26, 2012, Plaintiff's impairments did not meet or equal a Listing. (Tr. at 836.) The ALJ further found that medical improvement had occurred as of June 26, 2012, and that it related to Plaintiff's ability to work. (Tr. at 837.) The ALJ therefore considered Plaintiff's RFC and concluded that she could perform light work with additional restrictions. Specifically, the ALJ found that:

> beginning June 26, 2012, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she is limited to simple, routine, repetitive tasks of unskilled work; low stress, which is more fully defined as no constant change in routine, no complex decision making, and no crisis situations; no production rate work; occasional interaction with the public; occasional interaction with supervisors and coworkers; can stay on task for two hours at a time; avoid concentrated exposure to unprotected heights, moving machinery, and other dangerous conditions.

(Tr. at 837-838.)

The ALJ next found that Plaintiff was unable to perform any past relevant work (Tr. at 845), but determined that, given her age, education, work experience, and RFC, along with the vocational expert's testimony as to these factors, Plaintiff could perform other jobs available in the national economy beginning June 26, 2012. (Tr. at 25-26.) Therefore, the ALJ concluded that Plaintiff was no longer disabled under the Act as of that date through the date of the August 17, 2017 decision. (Tr. at 846.)

In the present appeal, Plaintiff contends that "[t]he ALJ improperly evaluated the opinion evidence" of Dr. Craig DuBois. (Pl.'s Br. at 6.) Plaintiff also contends that a remand is required because the Appeals Council erred by failing to consider new and material evidence. (Id. at 10.) The Court considers each contention in turn.

A.    The Treating Source Rule

Plaintiff first challenges the ALJ's decision to only assign "some weight" to Dr. DuBois' medical opinions. (Id. at 7-8.) This argument implicates 20 C.F.R. § 404.1527(c), better known as the "treating physician rule." This rule generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5; 20 C.F.R. § 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL

185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also SSR 96-2p (noting that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight").[6]

In the present case, in a letter dated January 17, 2017, Dr. DuBois advised:

> I continue to treat Norma Lauder for her seizure problem. I have reviewed the statement regarding her disability I previously provided on 1/25/12. Her condition is still about the same. She continues to suffer from partial complex seizures, and she had a generalized seizure recently. She typically becomes confused with loss of awareness, and then she suffers postical symptoms for a while. She is having these seizures a few times a month. The frequency has improved, but her cognitive function has not. She has mild encephalopathy, seizures, the side effects of medications and her mental health issues all coming together to cause cognitive impairment. No one is going to hire her. When I see her in the office, she exhibits cognitive slowness in responding to questions. She gets confused very easily. I usually have to write everything down for her and even then she calls back all the time to ask me what I said. She has not had an EEG since the last time I gave a statement. We do not have a diagnostic reason to do one.

> I have reviewed the Social Security Administration's regulations regarding epilepsy and disability. I can confirm that she meets the requirements for listing 11.02(D), in that she suffers from dyscognitive seizures, which is the same thing as partial complex seizures, at least a few times a month throughout the time period I have treated her. Her condition results in marked limitations in:

> 1. Understanding, remembering, or applying information; and
> 2. Interacting with others; and
> 3. Concentrating, persisting, or maintaining pace.

---

[6] The Court notes that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). However, the claims in the present case were filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

Again, although the frequency of her seizures has improved somewhat over time, her condition has always been severe enough to cause her interruptions to concentration sufficient to frequently interrupt tasks.

(Tr. at 1481.)

The ALJ discussed Dr. DuBois' opinions throughout his decision (Tr. at 833-834, 836-842) and then assigned these opinions "some weight" reasoning that

> [i]n association with this remand, there is an additional statement from Dr. DuBois dated January 2017, which was typed up by an associate of the claimant's attorney, parts of which are discussed above (Exhibit 48F). Dr. DuBois opined that no one is going to hire the claimant due to her various impairments, which is not a medical opinion. Dr. DuBois opined more specifically, that the claimant's condition results in marked limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace. He noted that though the frequency has improved somewhat over time, the claimant's condition has always been severe enough to cause her interruptions to concentration sufficient to frequently interrupt tasks (Exhibit 48F). The undersigned has given some weight to this opinion. It is not fully supported by the treatment records. As discussed more fully above, Dr. DuBois' treatment records from the past three years indicate that the claimant's cognition is normal to mildly deficient. He noted once that she demonstrated mild to moderate deficits (Exhibit 28F, pp. 2, 3, 45F, pp. 1, 4). The claimant has some limitations, which are considered in the residual functional capacity. Although my observations are not meant to be a substitute for a doctor's evaluation, and only a snapshot, in the limited time I saw the claimant, she seemed normal and able to function intellectually.

(Tr. at 843.)

For the following reasons, the ALJ's decision to afford Dr. DuBois' opinions some weight is supported by substantial evidence. First, as the ALJ correctly noted, Dr. DuBois' statement that "no one is going to hire" Plaintiff was not a medical opinion entitled to any deference. (Tr. at 843). See 20 C.F.R. § 404.1527(d).

Second, the ALJ also correctly pointed out that, contrary to his January 2017 opinion, Dr. DuBois repeatedly found upon examining Plaintiff that her symptoms had improved and

were only mild to moderate. (Tr. at 843.) For example, the ALJ accurately pointed out that in February 2014, Dr. DuBois found that Plaintiff exhibited normal cognition. (Tr. at 840, 1079.) At that time, Dr. DuBois noted that Plaintiff had denied having seizures since her last visit. (Tr. at 838, 1079.) In May 2015, Dr. DuBois found that Plaintiff demonstrated normal language and exhibited only mild to moderate deficits in cognition. (Tr. at 843, 1078.) In August and September 2016, Dr. DuBois found that Plaintiff demonstrated normal language and cognition. (Tr. at 840, 1449, 1451.) In December 2016, Dr. DuBois found that Plaintiff exhibited only mild deficits in cognition. (Tr. at 840, 1447.)

Third, the ALJ also explained that, contrary to Dr. DuBois' January 2017 opinion, Daniel Kitei, D.O., wrote in October 2012 that Dr. DuBois had informed him that Plaintiff "was not having seizures and was not impaired from her seizures." (Tr. at 838, 1374.)

Fourth, the ALJ noted that, in December 2012, Dr. DuBois wrote that Plaintiff experienced only two seizures over the prior six months, contrary to his claim that she experienced "a few" seizures per month. (Tr. at 838, 802, 1481.) Although Dr. DuBois noted that Plaintiff's seizure activity increased in 2013 due to stress, by September 2013, Dr. DuBois described Plaintiff as doing "extremely well since last seen with no further seizures." (Tr. at 838, 800.) Dr. DuBois thought Plaintiff was doing well enough at that time to pursue getting her driver's license (Id.) The following month, Dr. DuBois recorded that Plaintiff was still doing well and may go three months without a seizure. (Tr. at 838, 799.) Dr. DuBois wrote that Plaintiff's seizures all occurred during the evening (not the workday) and that she had a three-to-five minute physical warning prior to onset so that she could make sure she was safely pulled over if driving or otherwise was able to protect herself from hazards. (Id.) At her

follow-up with Dr. DuBois in February 2014, she denied experiencing any seizures since her last visit. (Tr. at 838, 1079.) At Plaintiff's next visit with Dr. DuBois in May 2015, she reported that she had experienced only three mild seizures since February 2014. (Tr. at 838, 1077.) In December 2016, Plaintiff reported having only one seizure over the prior three months, but she noted having frequent aura sensations and zoning out almost daily. (Tr. at 838, 1446.)

Fifth, the ALJ explained that Dr. DuBois' statements regarding the frequency of Plaintiff's seizures were also inconsistent with Plaintiff's seizure logs from 2014 and 2016, which often indicated weeks or month-long periods without seizure activity. (Tr. at 838, 1484-85, 1478-80.) The ALJ further wrote that, even assuming that Plaintiff experienced weekly seizures, the evidence indicated that there was little likelihood they would be experienced during the workday because of their prominence during nighttime hours. (Tr. at 839, 799.)

Sixth, the ALJ also found that Plaintiff's cognitive impairments were not as severe as Dr. DuBois claimed in his January 2017 letter. (Tr. at 839.) The ALJ noted that Plaintiff had completed a cognitive remediation program with Jeffrey Ewert, Ph.D. that improved her attention and coping skills. (Tr. at 839, 766-770.) Dr. Ewert wrote that, as of June 26, 2012, Plaintiff demonstrated improved sustained attention and reading skills. (Tr. at 839, 766.)

Seventh, the ALJ further pointed out that in May 2013 Catherine Clodfelter, Ph.D., administered a neuropsychological evaluation and concluded that Plaintiff was malingering. (Tr. at 839-840, 1398-1405.) Dr. Clodfelter concluded that Plaintiff was not putting forth a full effort on her cognitive testing, and thus, the results were not reliable. (Tr. at 839-840, 1403-1404.) Dr. Clodfelter wrote that the "test data do not support claims of cognitive

impairment." (Tr. at 1404.) She concluded that "[t]here is no evidence in these test data that [Plaintiff] would be unable to return to work part time or full time immediately." (Tr. at 1405.)

Eighth, the ALJ also observed that in 2015 Plaintiff's activities of daily living included completing household tasks, caring for pets, watching television, trying to read, sewing, attending doctor's appointments and that her interests and hobbies included reading, genealogy research, and sewing. (Tr. at 841, 1488.) The ALJ noted further that in 2013 Plaintiff testified that her activities of daily living included vacuuming, laundry, and washing dishes. (Tr. at 832, 69.) The ALJ noted too that Plaintiff often drove during the relevant period despite allegations of disabling seizures and cognitive impairment. (Tr. at 840-841, 882-883, 888-890, 1450, 1478-1480.)

Ninth, the ALJ further noted that Plaintiff worked from August 25, 2014 through November 7, 2014, performing her previous skilled work. (Tr. at 840, 1493, 1021, 1029.) Although these efforts were ultimately unsuccessful, the ALJ concluded that this was evidence that Plaintiff could perform unskilled work. (Tr. at 840.) The ALJ also gave great weight in general to the non-examining state agency physical and psychological consultants, all of whom conclude that Plaintiff had some limitations. However, none of these consultants concluded that Plaintiff was as limited as Dr. Dubois indicated and none of them concluded that Plaintiff was disabled or as limited as she alleged. (Tr. at 844, 84-96, 98-112, 948-970.) For all these reasons, the Court concludes that the ALJ's decision to afford Dr. Dubois' opinions only some weight is supported by substantial evidence.

Plaintiff's arguments to the contrary are not persuasive. She contends that the marked limitations that Dr. Dubois found are consistent with his treatment records. (Pl.'s Br. at 5.)

But, as demonstrated above, this is not the case and Plaintiff's argument amounts to, at most, an invitation for the Court to reweigh the record, which the Court will not do. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (in reviewing for substantial evidence, the court does not undertake to re-weigh conflicting evidence).

Plaintiff next contends that the ALJ's assessment of Dr. Dubois' opinion is not susceptible to review because his conclusion that those opinions are not fully supported by the record is too vague. (Pl.'s Br. at 9.) As demonstrated above, however, the ALJ's decision includes extensive explanation and analysis, is susceptible to judicial review, and is supported by substantial evidence.

Last, Plaintiff contends that the ALJ erred in stating that "[a]lthough my observations are not meant to be a substitute for a doctor's functional evaluation, and only a snapshot, in the limited time I saw the claimant, she seemed normal and able to function intellectually." (Pl.'s Br. at 9 referencing Tr. at 843.) However, even assuming this is the sort of impermissible "sit and squirm" method of adjudication the Fourth Circuit has rejected, see Jenkins v. Sullivan, 906 F.2d 107, 108 (4th Cir. 1990)[7], any error is harmless. This is because the ALJ gave many other reasons, set forth above, supporting both his overall decision in general and, more specifically, his decision to partially discount Dr. Dubois' opinions. See Toms v. Colvin,

---

[7] In the case as originally styled, Jenkins v. Bowen, 819 F.2d 1138, 1987 WL 37525 (4th Cir. May 18, 1987) (unpublished), the Fourth Circuit held that:

> The ALJ also erred by engaging in so-called sit and squirm jurisprudence when he discounted Jenkins' testimony about pain based on his observation that Jenkins did not seem to be in pain or discomfort at the hearing. This kind of determination is inappropriate for an ALJ, and is generally condemned. See, e.g., Freeman v. Schweiker, 681 F.2d 727, 731 (2d Cir.1982). The ALJ is not a physician qualified to make such determinations. In addition to the obvious danger of unreliability, such an approach "may encourage claimants to manufacture convincing observable manifestations of pain or, worse yet, discourage them from exercising the right to appear before an Administrative Law Judge for fear that they may not appear to the unexpert eye to be as bad as they feel." Tyler v. Weinberger, 409 F.Supp. 776, 789 (E.D.Va.1976).

No. 1:10CV856, 2014 WL 509195, at *10, n.10 (M.D.N.C. Feb. 7, 2014) (collecting cases:

Shrewsbury v. Chater, No. 94–2235, 1995 WL 592236, at *5 (4th Cir. Oct. 6, 1995)

(unpublished) ("[I]t is not reversible error for an ALJ to consider a claimant's demeanor when

he has already determined that the claimant's alleged level of pain is inconsistent with the

objective medical evidence."); Copeland v. Brown, 1989 WL 90545, at *3 (4th Cir.1989)

(unpublished) (concluding that it was error for the ALJ to conclude in his decision that "the

undersigned has had the opportunity to observe the claimant at the hearing where his attention

was unimpaired," but that the error was harmless in light of other "objective evidence that the

claimant's pain, though perhaps sometimes severe, was not debilitating"); Parker v. Colvin,

No. 1:10–CV–650, 2013 WL 4671765, *8 (M.D.N.C. Aug. 30, 2013) (concluding that it was

not error for the ALJ to find in his decision that the claimant "had no difficulty testifying

whatsoever [and][t]here were no apparent concentration deficits" where the ALJ did not

exclusively rely on his observations of Plaintiff at the hearing in discounting her credibility).

B.     Appeals Council Evidence

Next, Plaintiff argues that the case should be remanded so that an ALJ can consider

the evidence she submitted for the first time to the Appeals Council. (Pl.'s Br. at 7-11, citing

Tr. at 815.) This argument is not persuasive.

The regulatory provision governing the Appeals Council's consideration of new

evidence, 20 C.F.R. § 404.970, changed in 2017. The prior version of those regulations, in

effect until January 16, 2017, provided as follows:

> If new and material evidence is submitted, the Appeals Council shall consider
> the additional evidence only where it relates to the period on or before the date
> of the [ALJ] hearing decision. The Appeals Council shall evaluate the entire
> record including the new and material evidence submitted if it relates to the

period on or before the date of the [ALJ] hearing decision. It will then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b) (1987).

The new version, effective January 17, 2017, with compliance by claimants required by May 1, 2017, see Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987-01, 90987, 2016 WL 7242991 (Dec. 16, 2016), provides as follows:

(a) The Appeals Council will review a case if–

. . . .

(5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

(b) The Appeals Council will only consider additional evidence under paragraph (a)(5) of this section if you show good cause for not informing us about or submitting the evidence as described in § 404.935 because:

(1) Our action misled you;

(2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or

(3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier.

20 C.F.R. § 404.970 (2017). In conjunction with the above-described regulatory change, the Social Security Administration amended its internal procedures manual to clarify when evidence submitted to the Appeals Council qualifies as new, material, and related to the period on or before the ALJ's decision. See Hearings, Appeals, and Litigation Law Manual

17

("HALLEX"), § I-3-3-6B.2 ("Additional Evidence") (May 1, 2017), available at https://www.ssa.gov /OP_home/hallex/I-03/I-3-3-6.html. According to the HALLEX, evidence submitted to the Appeals Council is: "new if it is not part of the [administrative record] as of the date of the [ALJ's] decision"; "material if it is relevant, i.e., involves or is directly related to issues adjudicated by the ALJ"; and "relate[d] to the period on or before the date of the hearing decision if the evidence is dated on or before the date of the hearing decision, or . . . post-dates the hearing decision but is reasonably related to the time period adjudicated in the hearing decision." HALLEX, § I-3-3-6B.2.

Here, after the ALJ's August 17, 2017 decision, Plaintiff submitted to the Appeals Council a one-page radiology report from Lake Norman Regional Medical Center, dated September 19, 2017. (Tr. at 804, 815.) Under the "Clinical History" heading it states "Indications: Low back pain. Bilateral leg pain." (Tr. at 815.) The summary of findings in that report provides: "Impression: Free disc fragment behind the body of L2 on the right. Small lateral foraminal disc herniation on the left at L3, 4. Small broad central to right paracentral disk herniation at L4-5." (Tr. at 815.) In considering this submission, the Appeals Council stated:

> You submitted radiology results from Lake Norman Regional Medical Center dated September 19, 2017 (1 page). The Administrative Law Judge decided your case through August 17, 2017. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before August 17, 2017.

(Tr. at 804.)

Plaintiff contends that this was error because the one-page radiology report does relate to the relevant period because it is "reflective of a possible earlier and progressive

deterioration." (Pl's Br. at 14 citing Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 345 (4th Cir. 2012).) She contends further that this lumbar MRI evidence "provides the objective diagnostic support for additional limitations the ALJ found lacking." (Pl's Br. at 13.) In support, Plaintiff points to the finding by the ALJ in which he declines to adopt postural limitations identified by the non-examining state agency physicians. (Id. quoting Tr. at 844 ("The undersigned does not find objective support for the postural limitations noted in [the] assessments [of the non-examining state agency physicians]."").) In making this finding, the ALJ referenced Exhibits 3A and 8A. (Id.) In the former, Dr. Perry Caviness, limits Plaintiff to never climbing ladders, ropes, or scaffolds, only occasionally climbing ramps or stairs, occasionally balancing, and only frequently stooping, kneeling, crouching, and crawling. (Tr. at 107-109.) In the latter, Dr. Dakota Cox, limits Plaintiff to only frequently balancing and climbing ramps or stairs and only occasionally climbing ladders, ropes, or scaffolds. (Tr. at 963-964.) As noted, the ALJ declined to adopt these postural limitations for lack of evidence supporting the same and Plaintiff contends that it is precisely this evidence which is now in the record in the form of the radiology report.

The Court concludes that even assuming the radiology report is new, material, and relates to the period on or before the date of the hearing decision, there is no meaningful possibility—much less a reasonable probability—that the additional evidence would change the outcome of the decision. As Plaintiff's counsel explained to the ALJ at the February 9, 2017 administrative hearing, the "core problem" in this case were her "intractable seizures." (Tr. at 868.) When asked what would prevent her from working as a janitor or a ticket taker, for example, Plaintiff did not mention back or leg pain or limitations related thereto, but

instead explained that she never knew when her seizures might hit. (Tr. at 885-886.) At no

point during either administrative hearing did Plaintiff—who has not contested the ALJ's

conclusion that she can perform light work—attribute an inability to work due to back or leg

pain, nor did she describe any limitations attendant to that pain.[8] (Tr. at 54-83, 866-914.)

Beyond this, the radiology report contains no functional limitations, does not explain

when the lumbar issues arose, and merely reports a diagnostic impression. (Tr. at 815.) See

Hawks v. Berryhill, No. 1:17CV1021, 2018 WL 6728037, at *7 (M.D.N.C. Dec. 21, 2018)

("[E]ven if the Appeals Council erred by finding that the [nerve conduction testing report] did

not relate to the period before the ALJ, any such error qualifies as harmless under the

circumstances of this case. Here, Plaintiff has not demonstrated that the NCS Report raises a

reasonable probability of a different outcome, . . . [in part because] the NCS Report merely

reflects possible neurological diagnoses and proffers no functional limitations arising out of

such conditions.").

Moreover, Plaintiff points to no evidence of any functional limitations that might stem

from or be related to the findings in the above-mentioned radiology report, other than the

---

[8] Nor does it appear that any challenge to the ALJ's finding that Plaintiff can perform light work would be successful, in light of the longitudinal tide of the record. (See Tr. at 1230 (7/14/13) (normal range of motion and strength, no tenderness); 800 (9/4/2013) (normal power, bulk, tone, "[s]ensation is relatively well preserved," coordination and gait "look fine"); 1146 (1/13/2014) (normal lower extremity sensation, normal muscle tone, stable gait and balance); 1150 (2/17/2014) (normal strength in upper and lower extremities, normal gait and balance); 1168 (8/7/2014) (normal gait, mobility, and sensation); 1541 (6/12/2015) (normal range of motion, normal strength); 1473 (11/11/2015) (normal range of motion, muscle strength, motor control, gait and station); 1469 (4/5/2016) (same); 1466 (8/24/2016) (same); 1463 (9/22/2016) (same); 1451 (8/17/2016) (normal power, bulk, tone, "[s]ensation relatively well preserved," coordination and gait "look fine"); 1449 (9/21/2016) (same); 1447 (12/06/2016) (same); 858 (4/11/2017) (finding on exam no back pain, normal gait and station, and normal range of motion in extremities); 861 (6/9/2017) (no back pain, joint pain, or muscle weakness; but see 1210 (2/27/2015) (mild lumbar spasm and tenderness with 4/5 strength in lower extremities); 1702 (4/17/2017) (4/5 strength in upper and lower extremities, mild cogwheeling in left bicep, difficulty rising from chair, rigid shuffling gait).)

postural limitations identified by the non-examining state agency physicians. However, according to the Dictionary of Occupational Titles ("DOT"), none of the jobs the ALJ concluded that Plaintiff could perform require meaningful changes in posture. According to the DOT, those positions—order caller, routing clerk, and work ticket distributor—do not require climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. at 846, 899.) (Order Caller, 209.667-014, 1991 WL 671807 (no climbing, balancing, stooping, kneeling, crouching, or crawling); Routing Clerk, 222.687-022, 1991 WL 672133 (same); Work Ticket Distributor, 221.667-010, 1991 WL 672062 (same).) Thus, even if—as Plaintiff contends— the radiology report demonstrates that the RFC should contain postural limitations, their absence from the RFC would have no impact on the outcome of this case.[9] Put differently, even if the Court were to adopt Plaintiff's argument as to the radiology report in total, it would have no impact on the outcome of this case. Consequently, this objection has no merit. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

---

[9] See, e.g., Hawks, 2018 WL 6728037, at *7; Belton v. Colvin, No. 1:14CV777, 2015 WL 5023087, at *10 (M.D.N.C. Aug. 24, 2015) (unpublished) (concluding that any error by the Appeals Council concluding that questionnaire did not relate to the relevant period was harmless, in part because the questionnaire was not material in that "[t]he severity of the limitations that were identified in Dr. Taylor's questionnaire were inconsistent with other evidence in the record, described in considerable detail throughout this Recommendation"); Gardner v. Colvin, No. CV 0:15-1123-RBH-PJG, 2016 WL 11396823, at *5 (D.S.C. Apr. 19, 2016) ("[E]ven if the Appeals Council erred in finding that [a doctor's letter] did not relate to the relevant time period, Gardner cannot demonstrate any harm from such an error" because "the record clearly shows that the additional evidence does not cause the ALJ's decision to be unsupported by substantial evidence, as Dr. Stoddard's letter fails to include an opinion on any functional limitations").

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #13] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #15] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 31st day of July, 2019.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
